Filed 4/21/21  P. v. Woldmskel CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076802, D077516 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD262961) |
| PATRICK WOLDMSKEL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed and remanded with directions.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.


In 2015, a jury convicted Patrick Woldmskel of various crimes related to his repeated physical abuse of his girlfriend.  Thereafter, the trial court

sentenced Woldmskel to 29 years in prison. Woldmskel appealed the conviction and this court remanded the matter to the trial court to determine whether he could obtain relief under newly enacted statutes providing for mental health diversion. The trial court denied the requested relief, reinstated the conviction, and resentenced Woldmskel to the same term but, in accordance with this court's earlier opinion, stayed the sentences of some convictions under Penal Code section 654.[1]

Woldmskel appeals again, asserting that the trial court abused its discretion by denying his request for mental health diversion. Woldmskel also asserts the court erred by failing to award custody credits he earned while the earlier appeal was pending and requests reversal of the true finding on the prison prior enhancement (§ 667.5, subd. (b)) based on recent changes to the law. After he filed his notice of appeal, Woldmskel filed a motion in the trial court seeking to reduce the $10,000 restitution fine it had imposed. The trial court denied the motion, and Woldmskel filed a second notice of appeal of that ruling. On Woldmskel's motion, we consolidated the appeals.

As we shall explain, we conclude the trial court did not abuse its discretion by finding Woldmskel was unsuitable for mental health diversion and the court properly denied his motion to reduce the restitution fine. We agree with Woldmskel, however, that the court failed to award him sufficient custody credits and that the prison prior enhancement must be reversed. Accordingly, the judgment is affirmed and the case is remanded to the trial court to amend the abstract of judgment to award Woldmskel custody credits of 1,551 days and to strike the one-year prison prior enhancement.

---

[1] All subsequent undesignated statutory references are to the Penal Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

Woldmskel and the victim dated for over a year. During that time, between June 2014 and January 2015, they lived together in a rented room. After, the victim lived off and on at the home of a friend until August 2015. Over the course of the relationship, Woldmskel was violently abusive to the victim on many occasions, resulting in the charges in this case.

The first charged offenses occurred on July 4, 2014. That day, Woldmskel and the victim were walking home when they started arguing. Woldmskel pushed the victim down into some bushes, then got into his truck and drove towards her, almost hitting her. He got out, dragged her by her hair into his truck, then drove home. Woldmskel dragged her inside, where he proceeded to punch her several times, spit on her, and bite her wrist hard enough to cause a sprain. He put his hands around her neck and strangled her to the point where she could not breathe. Woldmskel threw the victim against a wall, damaging the wall.

In September 2014, Woldmskel became upset after seeing the victim and a male friend hugging. Woldmskel put his hand around her neck and squeezed, cutting off her airway. He also punched her in the face, causing her head to hit the wall so hard it left a hole. Woldmskel then pinned her against the wall and slapped and punched her in the face.

In November 2014, around Thanksgiving, Woldmskel attacked the victim again. While in their bedroom, Woldmskel pushed her down, got on top of her and repeatedly punched her in the face and body. Woldmskel again put his hands around her neck and strangled her. Shortly after this incident, sometime between December 1 and 5, 2014, Woldmskel and the victim were riding in a car driven by a friend. Woldmskel, sitting in the front passenger seat, leaned back and bit the victim, who was sitting in the

backseat, on her cheek, causing a visible bite mark.  The victim sought treatment and received a tetanus shot.

On or about January 29, 2015, the victim and Woldmskel were in their bedroom while she was getting ready to go to her college class.  They began arguing because Woldmskel did not want her to leave.  He lunged towards her, and in an attempt to escape his grasp, the victim fell hard and her knee popped, causing extreme pain.  Woldmskel punched her in the head, got on top of her and would not let her get up; he strangled her off and on for about two minutes.  Woldmskel also bit her on the forehead and hand.

Woldmskel also locked the victim inside their bedroom, and when she tried to escape, he ran after her.  He put his hands around her neck and strangled her, causing her teeth to strike each other and a tooth to chip.  The victim testified she almost passed out during the attack.  After the attack, the victim walked with a limp and was in excruciating knee pain.  She sought treatment, which included an x-ray, and was diagnosed with swelling around the kneecap and given a brace and crutches.

On July 11, 2015, Woldmskel went to the house where the victim was living to get some of his belongings.  Woldmskel was agitated because the victim was ending the relationship and they began arguing.  The victim repeatedly asked Woldmskel to leave, but he refused.  The victim's roommate said something that angered Woldmskel further, and he aggressively lunged at the roommate.  The victim stepped between them to prevent Woldmskel from hurting the roommate.

Woldmskel punched the victim, causing her to fall backward.  The punch caused a medial orbital fracture to the victim's eye, and a laceration that bled profusely and left a scar.  During the violence, as he had done in the past, Woldmskel put his hands around the victim's neck and strangled her.  A

4

neighbor in the apartment below heard what sounded like someone getting thrown around and being hit hard.

The victim was treated at the hospital after the incident. Woldmskel was arrested a few days later and the court issued a criminal protective order requiring no contact with the victim. Woldmskel ignored the order and called the victim from jail several times. During the recorded calls, Woldmskel told the victim that during the preliminary hearing she should say she did not remember what happened and walk out of court. In another call, he told her not to go to court so that the district attorney's office could not go forward with the case. He also told her to change her address and phone number so the district attorney's office could not locate her. Woldmskel also called the landlord who had rented a room to Woldmskel and the victim and told her not to go to court and not to contact the district attorney's office.

The district attorney eventually charged Woldmskel with 15 counts related to the various instances of violence and Woldmskel's calls from jail: Four counts of inflicting corporal injury resulting in a traumatic condition (§ 273.5, subd. (a)), with a prior violation of section 243, subdivision (e) within the meaning of section 273.5, subdivision (f)(2) (counts 1, 3, 6, 9); four counts of assault by any means of force likely to produce great bodily injury (§ 245, subd. (a)(4); counts 2, 4, 7, 8, 10); two counts of false imprisonment by means of violence, menace, fraud, and deceit (§§ 236, 237, subd. (a), counts 5, 11); two counts of attempting to dissuade a witness from testifying (§ 136.1, subd. (a)(2), counts 12, 13); and two misdemeanor counts of violating a protective order (§ 166, subd. (c)(1), counts 14, 15).

During trial, the prosecution introduced evidence of prior acts of domestic violence committed by Woldmskel. A woman with whom Woldmskel shared two children and had a decade-long relationship testified

about two significant instances of abuse.[2] Another witness testified she dated Woldmskel off and on for about three years, and during that time he had been violent more times than she could count. She recalled that Woldmskel pushed, bit, strangled, and scratched her during their relationship.

After the conclusion of the trial, the jury found Woldmskel guilty of three counts of inflicting corporal injury to a spouse or cohabitant resulting in a traumatic condition (§ 273.5, subd. (a); counts 1, 3, 9); four counts of assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); counts 2, 4, 8, 10); two counts of false imprisonment by means of violence, menace, fraud or deceit (§§ 236, 237, subd. (a); counts 5, 11); two counts of attempting to dissuade a witness from testifying (§ 136.1, subd. (a)(2); counts 12, 13); and two misdemeanor counts of violating a protective order (§ 166, subd. (c)(1); counts 14, 15). As to counts 1 and 2, the jury found true the allegations that Woldmskel personally inflicted great bodily injury under circumstances involving domestic violence (§§ 1192.7, subd. (c)(8), 12022.7, subd. (e)).

Woldmskel waived a jury trial on the prior conviction allegations, and admitted a prison prior (§§ 667.5, 668), a strike prior (§§ 667, subds. (b)–(i), 668, 1170.12), and a prior serious felony conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)(8)). Thereafter, the trial court sentenced Woldmskel to 29 years in state prison. The court reserved on victim restitution and imposed a $10,000 restitution fine pursuant to section 1202.4; a $10,000 parole revocation fine, which was stayed; a $154 criminal justice administrative fee pursuant to Government Code section 29550.1; a $520 court security fee

---

[2]    Police report records suggested the incidents were more severe and frequent than the woman would admit during trial.

pursuant to section 1465.8; and a $390 criminal conviction assessment fee pursuant to Government Code section 70373.

Woldmskel appealed, claiming instructional and sentencing errors. While the appeal was pending, he filed a supplemental opening brief contending that the newly enacted mental health diversion statute applied retroactively to his case, requiring remand for a mental health diversion hearing. He also asserted remand was necessary to allow the trial court to exercise its newly authorized discretion to strike punishment on the five-year serious felony enhancement.

This Court rejected Woldmskel's instructional error arguments, and found the trial court did not abuse its discretion by not striking the prior strike conviction. The Court agreed with the People's concession that execution of the sentence for counts 4, 5, 10, and 11 should have been stayed under section 654. However, the Court reversed the judgment and remanded the case to the trial court with directions to conduct a diversion eligibility hearing under section 1001.36 and consider whether to exercise its newly authorized discretion under sections 667, subdivision (a) and 1385, subdivision (b) to dismiss the punishment for the prior serious felony conviction.

After remand, Woldmskel filed a motion requesting mental health diversion. The trial court denied the motion, and reinstated the convictions and the sentence previously imposed. The trial court declined to exercise its discretion to strike the five-year serious felony enhancement, but, pursuant to this Court's opinion, stayed punishment on counts 4, 5, 10, and 11. Woldmskel filed a notice of appeal from the new judgment.

Thereafter, Woldmskel filed a pro per motion asking the trial court to conduct a hearing on his ability to pay and reduce the $10,000 restitution fine

7

imposed under section 1202.4 to $200.  The trial court denied the motion on the ground that Woldmskel forfeited the issue by not raising it at the sentencing hearing.  The trial court also found that it did not have jurisdiction to rule on the motion.  Woldmskel filed a second notice of appeal from that ruling.  On Woldmskel's motion, we consolidated the appeals.

DISCUSSION

I

*Mental Health Diversion*

Woldmskel contends the trial court abused its discretion when it denied his motion for mental health diversion after finding his mental disorder was not a significant factor in his criminality and that he posed an unreasonable risk of danger to public safety.  The Attorney General responds that the trial court considered the appropriate factors and properly denied the request.  We agree.

A

*Additional Background*

After this court remanded the case, Woldmskel filed a written motion in the trial court requesting mental health diversion under section 1001.36. To the motion he attached a Social Security Administration report, dated April 17, 2015; a letter from Dr. Ferma, a Licensed Clinical and Forensic Psychologist, dated April 13, 2017; a certificate showing that Woldmskel had participated in "Life Skills Topic Anger. Creating New Choices," while in prison; and two handwritten letters from Woldmskel, one to the court and the other to the victim.  Based on the Social Security Report and the letter from Dr. Ferma, Woldmskel's motion asserted (1) he suffered from recognized mental disorders, including chronic psychosis, schizophrenia, auditory hallucinations, and paranoia; (2) his mental health disorders played a

8

significant factor in the commission of the charged offenses; (3) the symptoms of the mental disorders would respond to mental health treatment; and (4) that he consented and agreed to comply with treatment as a condition of diversion.

The district attorney opposed the motion. The prosecutor argued that (1) the County of San Diego had not approved or funded a mental health diversion program pursuant to section 1001.36; and (2) Woldmskel had not met all six eligibility requirements for mental health diversion under the statute. Specifically, the prosecutor asserted Woldmskel's mental health disorder did not play a significant role in the commission of the offenses, a qualified mental health expert had not opined that the symptoms motivating Woldmskel's behavior would respond to treatment, he was unlikely to comply with treatment as a condition of diversion, and he would pose an unreasonable risk of danger to public safety if treated in the community.

At the hearing on the motion, Woldmskel testified that he first began suffering from mental health issues when he was eight or nine years old, when he was diagnosed with attention deficit disorder. He was prescribed Ritalin and Wellbutrin, which he took until he was about 16 or 17 years old. He stopped taking the medication because he was having hallucinations, and was seeing and hearing things that were not there. Woldmskel also stated that he was first diagnosed with "ADHD" after he was stabbed by 18 different people at a riot and his lung collapsed, which also resulted in a 2008 diagnosis of post-traumatic stress disorder. During this timeframe, he applied for Social Security Disability because the medication he was prescribed, Seroquel, and his symptoms from paranoia made it difficult to work.

9

Woldmskel also testified that when he was 18 years old, he had just been released from a mental hospital when he got into an argument with his next-door neighbor. This resulted in a conviction for criminal threat and was the basis for his prior strike. He also testified he stopped taking Seroquel when he left the mental hospital. In 2014, after another stabbing, Woldmskel said he was hallucinating a lot, prompting his mother and the victim to take him to "Project Enable" where he was prescribed multiple medications including Zyprexa and Haldol. He testified that on the medications he felt "out of it" and "off."

Woldmskel claimed he did not remember the incident in July 2014 when he pushed the victim into bushes. He said he was on seven different medications at that time and they caused him to black out. Woldmskel also testified he could not remember the incident in September 2014, when he punched the victim and pushed her into a wall. He said he had a blackout and was seeing images of the victim with a knife in her hand, and he remembered "flipping out and screaming," and claimed he put his hand through a window, and that when he "snapped out of it" his hand and wrist was bloody, and he did not remember anything that had happened. Woldmskel also testified he could not remember the crimes that occurred in January 2015 or July 2015.

Woldmskel explained that since being incarcerated, he was off many of the medications and was more functional. Based on comments from a psychologist he saw in prison, he believed a medication he had been on before his convictions, Risperdal, caused severe hallucinations and manic episodes during the time he committed the crimes. Woldmskel also testified that because he was on Risperdal he could not recall that he was removed from the courtroom during trial because of his behavior. He said he was currently

10

taking anti-anxiety medications Zyprexa and Buspar, which allowed him to function, and that he had not had any incidents in prison. Woldmskel agreed that he had anger management issues in the past, but he did not think he currently had them because of his new medications.

On cross-examination, Woldmskel acknowledged that when he was a child he received family counseling, was on medication, and as a juvenile, committed crimes such as making threats and vandalism. He again admitted the strike prior. He admitted earlier instances of domestic violence and threats, some of which resulted in earlier convictions. He also admitted earlier crimes, including burglary, receiving stolen property, and using force on police officers. When the prosecutor asked whether he was medicated or receiving treatment when he committed these crimes, Woldmskel responded that he sought mental health treatment after 2009, when he was stabbed in prison. He also admitted later convictions for driving under the influence and that he was not consistent in treatment for his mental health.

Woldmskel denied abusing his girlfriend before the victim. He did acknowledge a misdemeanor domestic violence conviction from 2013. Woldmskel repeated his assertion that he could not remember much of the violence that resulted in his convictions and asserted the victim was responsible for some of his outbursts, or they occurred because he was off his medication. He admitted he sought and obtained treatment at Project Enable and at a hospital, but that even after treatment he continued to be violent towards the victim.

Woldmskel admitted he tried to prevent witnesses from going to court to testify against him, that he violated the criminal protective order multiple times by calling the victim, and that he had a friend help the victim "hide out" so she did not appear at the preliminary hearing. He also admitted he

11

was calm during these times and was not experiencing hallucinations or other mental health symptoms.

After argument from counsel, the court denied Woldmskel's motion. The court found Woldmskel had shown he suffered from recognized mental disorders, satisfying the first requirement for diversion. However, the court concluded Woldmskel had not satisfied other requirements. The court found Woldmskel failed (1) to show his mental disorders substantially contributed to the offenses, (2) to identify what treatment plan he would undertake, and (3) to show he would not pose an unreasonable risk of danger to public safety.

B

*Legal Standards*

Section 1001.36 generally allows for pretrial diversion for persons suffering from certain mental illnesses. The statute defines " 'pretrial diversion' " as the "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment …." (§ 1001.36, subd. (c).) The stated purposes of the diversion program are "(a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶ And] (c) [p]roviding diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35.)

As originally enacted in 2018, section 1001.36, subdivision (b), provided pretrial diversion may be granted if six eligibility criteria are met. (Stats.

2018, ch. 34, § 24.)  As amended three months later, a revised version of the statute, now in effect, slightly modified the criteria and also prohibits defendants from receiving pretrial diversion if they are charged with certain specified offenses.  (§ 1001.36, as amended by Stats. 2018, ch. 1005, § 1.)

Under section 1001.36, a trial court may grant pretrial diversion after it is satisfied that six criteria are fulfilled:  The defendant is suffering from a recognized mental disorder; the disorder played a significant factor in the commission of the charged offense; in the opinion of a qualified mental health expert the symptoms of the mental disorder motivating the criminal behavior would respond to treatment; the defendant consents to diversion; the defendant agrees to comply with treatment; and the defendant does not pose an unreasonable risk of danger "to public safety, as defined in Section 1170.18, if treated in the community."[3]  (§ 1001.36, subd. (b).)

Even if a defendant otherwise satisfies the six eligibility requirements, the court must also be satisfied that the recommended mental health treatment program "will meet the specialized mental health treatment needs of the defendant."  (§ 1001.36, subd. (c)(1)(A).)  In exercising its discretion to approve diversion, the court must "consider the request of the defense, the request of the prosecution, the needs of the defendant, and the interests of the community."  (§ 1001.36, subd. (c)(1)(B).)

---

[3]    Section 1170.18, subdivision (c), states that an unreasonable risk of danger to public safety "means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." Section 667, subdivision (e)(2)(C), in turn, lists felonies known as "super strikes," which include the crimes of murder, attempted murder, and any serious or violent felony punishable by life imprisonment or death.  (*People v. Jefferson* (2016) 1 Cal.App.5th 235, 242 (*Jefferson*).)

13

Section 1001.36 states that the trial court "may, after considering the positions of the defense and prosecution, grant pretrial diversion to a defendant pursuant to this section if the defendant meets all of the requirements," and further references a trial court's exercise of discretion in determining whether to grant diversion. (§ 1001.36, subds. (a) & (h).) Thus, a trial court's decision whether to grant diversion is subject to review for abuse of discretion. (See *Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 708 [applying abuse of discretion standard to section 1001.80 pretrial diversion].) The trial court's factual findings in support of its exercise of discretion are reviewed for substantial evidence. (*People v. Jones* (2013) 57 Cal.4th 899, 922.) An abuse of discretion thus occurs if the court applies an erroneous legal standard or its factual findings are not supported by substantial evidence. (*Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 110.)

C

*Analysis*

Woldmskel argues the trial court abused its discretion by concluding he did not qualify for mental health diversion because he provided substantial evidence that he met each of the six criteria. In his briefing, Woldmskel identifies the evidence he believes shows he met each of the criteria.[4]

Woldmskel asserts "[t]he documentation [he] produced…, which included the opinions of two mental health care professionals, coupled with [his] own testimony, *irrefutably established* his mental disorders, as well as the ineffective treatment of same, played a significant role in the commission

---

[4]    As an initial matter, Woldmskel argues a point not in dispute. He asserts correctly that there was sufficient evidence to support the trial court's determination that he suffered from serious mental illness, satisfying the first criteria of section 1001.36, subdivision (b).

of the charged offense." (Italics added.) In support, he points to a report issued in 2015 by the administrative law judge (ALJ) who presided over his proceeding for social security disability benefits. In the report, the ALJ notes his reliance on the report of an impartial board certified psychiatrist, who testified in the disability proceeding that Woldmskel had a long "history of chronic psychosis" and that Woldmskel had only received active treatment since 2014 with "potent and expensive psychotropic medications that have had little effect on his ability to function better."

Woldmskel also relies on a report prepared by a licensed clinical psychologist hired by his prior counsel in 2017 for purposes of sentencing, who interviewed Woldmskel twice in prison and reviewed his medical files and criminal history. Woldmskel points to that psychologist's statement that "as of 2016," Woldmskel's lack of treatment "resulted in him decompensating, with increasingly severe psychosis and paranoia that affected his behaviors in a negative manner and placed himself and others at risk for harm." Finally, Woldmskel contends his own testimony that he was hallucinating and "flipped out" at the time of the September 2014 incident showed his mental illness was a significant factor in his commission of the offenses in this case.

We agree with the trial court's assessment that this evidence did not conclusively establish Woldmskel's mental illness was "a significant factor in the commission of the charged offense[s]." (§ 1001.36, subd. (b)(1)(B).) Under the statute, the court may base its decision on "any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical

15

experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense ….” (*Ibid*.)

Here, the court's decision was properly based not only on the evidence that Woldmskel put forward, but also on the court's own prior involvement in the case as both the trial and sentencing court. While it is clear on this record that Woldmskel suffered from mental illness, the circumstances here supported the finding that it was not a significant factor in these crimes. Specifically, as the Attorney General points out, after each incident of domestic abuse, Woldmskel manipulated the victim into not calling the police, and after his arrest, convinced her to hide out and avoid going to court to testify at the preliminary hearing. These facts showed Woldmskel's actions were thought-out, not just reactions to disordered thoughts.

Further, the reports of the ALJ and psychologist contained no evidence specifically connecting Woldmskel's mental illness to the actual crimes at issue. The discussion of Woldmskel's mental health by the ALJ contains no mention of Woldmskel's crimes. The report of the psychologist does generally suggest that Woldmskel's long history of mental illness was a factor in his crimes, but contains no specific explanation of a link between the two. Rather, the report states only that because of his illness, “it is less surprising that he engaged in these types of behaviors during the time periods in which they occurred,” and that Woldmskel's “level of paranoia and the auditory hallucinations he experiences (which are sometimes command-type) affect his actions and behaviors and increase his risk for becoming a danger to himself []or others.” No information in the report directly tied his illness to any of the events that resulted in his conviction.

Finally, contrary to Woldmskel's assertion, his own testimony was not conclusive about the impact of his mental illness on his commission of the

16

crimes. Rather, the testimony was both imprecise about his illness and entirely self-serving. In sum, we do not agree with Woldmskel that the evidence showed conclusively that his longstanding mental illness had a significant impact on his commission of these crimes.

Even if this second criterion had been satisfied, the third was not. Section 1001.36, subdivision (b)(1)(C) requires the defendant to show that in "the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." No evidence supported such a finding in this case. To support his argument that the criterion was satisfied, Woldmskel again points to the testimony of the psychiatrist cited by the ALJ, the psychologist's report prepared for Woldmskel's initial sentencing, and his testimony that once he was on different medications in prison he felt his anger management issues had improved.

This evidence did not establish that mental health treatment would resolve the anti-social behavior that resulted in Woldmskel's conviction. To the contrary, the ALJ's report stated that the psychiatrist who examined Woldmskel opined that past treatment had "little effect on his ability to function better." Similarly, the psychologist's report stated Woldmskel suffered from "severe mental illness that is difficult to manage and that require[s] constant treatment and monitoring to manage." Likewise, Woldmskel's own testimony showed he had received different treatments for his mental illness throughout his life, but none were successful in mediating his anti-social behavior. Given these undisputed facts, the trial court did not abuse its discretion in concluding Woldmskel's mental illness was unlikely to respond to treatment.

Assuming for argument the fourth and fifth criterion—the defendant's agreement to diversion and treatment—were satisfied by Woldmskel's statements, Woldmskel has also not shown the trial court abused its discretion by finding he failed to satisfy the final criteria. Section 1001.36, subdivision (b)(1)(F) requires the court to be satisfied "that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." As Woldmskel points out, section 1170.18 defines an unreasonable risk of danger to public safety as "an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).) The violent felonies at issue are "super strikes," and include the crimes of murder, attempted murder, and any serious or violent felony punishable by life imprisonment or death. (*Jefferson, supra*, 1 Cal.App.5th at p. 242.)

Woldmskel argues the court erred by not specifically addressing the likelihood he would commit a super strike, and that there was no evidence to support a finding he would if he were referred to mental health diversion. Woldmskel also states "at least with regard to the diversion hearing, there was nothing indicating the trial court reviewed the totality of appellant's criminal history." These arguments are not well taken.

The statute provides that in assessing the risk to public safety posed by granting diversion, the trial court can "consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (b)(1)(F).) As discussed, contrary to Woldmskel's assertion that nothing in the record shows the court's familiarity with his criminal history, the court

18

was well versed in the facts and procedural history of this case and his prior convictions. Those convictions included three counts of inflicting corporal injury to a cohabitant resulting in a traumatic condition, four counts of assault by means likely to produce great bodily injury, and two counts of false imprisonment by means of violence, menace, fraud, or deceit. Further, the jury in this case found that Woldmskel inflicted great bodily injury under circumstances involving domestic violence as to two of the charged counts.

Because the trial court heard and denied Woldmskel's earlier *Romero* motion, the court was also familiar with his criminal history. Woldmskel's continuing and escalating violence inflicted on the victim in this case—from punching and pushing to strangling and biting her, and causing injury to her knee and a medial orbital fracture to her eye—combined with his criminal history amply supported the trial court's finding that Woldmskel posed an unreasonable risk of danger to public safety because he was capable of committing a super strike offense in the future. Indeed, the crimes he committed could easily have resulted in the victim's death.

Further, Woldmskel's history of failing to stay in treatment and continuing to engage in violent conduct, or engaging in such conduct while in treatment, supported the court's finding that Woldmskel posed a danger to public safety if granted diversion. Indeed, the psychologist employed by his defense counsel in 2017 opined Woldmskel would have difficulty achieving stability even with medications. As the Attorney General states, Woldmskel's "willingness to resort to violence and his unwillingness to seek consistent or effective treatment ma[d]e it more than reasonable [for the trial court] to conclude that he will continue to pose a danger to society."

In sum, the trial court applied the correct legal standard and considered all of the evidence. The court reasonably concluded that

19

Woldmskel's mental health disorder did not play a significant role in the commission of the charged offenses, and that if treated in the community, he would pose an unreasonable risk of danger to public safety. Woldmskel's challenge amounts to a request for this court to supplant his view of the evidence for that of the trial court. That is not our role.

## II

### *Modification of Abstract of Judgment to Reflect Custody Credit*

When a case is remanded for resentencing, upon completion of the process the trial court must recalculate custody credit to the day of the latest sentencing. (§ 2900.1; *People v. Buckhalter* (2001) 26 Cal.4th 20, 23, 37.) Here the trial court calculated credits only up to the original 2017 sentencing hearing, not the resentencing date of October 11, 2019. The credits that should have been awarded on resentencing are 1,551. The parties correctly assert the case must be remanded to the trial court to modify the judgment to award the correct number of custody credits.

## III

### *Prison Prior Enhancement*

Woldmskel's sentence was enhanced by one year based on the jury's true finding on the allegation that he had previously served a prison term. (§ 667.5.) At the time, the enhancement applied to each prior separate prison term served by the defendant. Senate Bill No. 136, which went into effect on January 1, 2020, amended section 667.5 to provide that the enhancement applied only to each prior separate prison term the defendant served for a sexually violent offense. (Sen. Bill No. 136 (2018–2019 Reg. Sess.) § 1.) The new law applies retroactively to all cases not final on appeal at the time of the statute's effective date. (*In re Estrada* (1965) 63 Cal.2d 740; *People v. Graves* (2020) 46 Cal.App.5th 231, 236–237; *People v. Petri* (2020) 45

20

Cal.App.5th 82, 94.)  The parties correctly point out that Woldmskel's prior prison term was not for a sexually violent offense. Accordingly, we direct the trial court on remand to strike the one-year enhancement under section 667.5.

## IV

### *Ability-to-Pay Restitution Fines & Fees Hearing*

Woldmskel raises several arguments related to the restitution fine and other fees imposed on him at sentencing.  He asserts the trial court erred by denying his motion for a hearing on his ability to pay the fines after he filed his notice of appeal.  Additionally, Woldmskel argues that this court should remand the matter or strike the fines and fees under the reasoning of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

### A

As discussed, at his initial sentencing in 2017, the court imposed a $10,000 restitution fine (§ 1202.4), imposed and stayed a $10,000 parole revocation restitution fine (§ 1202.45), and imposed a $520 court security fee (§ 1465.8), a $390 criminal conviction assessment fee (Gov. Code, § 70373), and a $154 criminal justice administrative fee (*Id*., § 29550.1).  At his resentencing in 2019, the court reimposed the previous fines and fees. Woldmskel raised no objection to the fines and fees at either hearing.

After he filed his notice of appeal from the denial of his motion for mental health diversion and subsequent resentencing, Woldmskel filed a motion in pro per to reduce the restitution fine from $10,000 to $200.  The court denied the motion, finding that Woldmskel forfeited the issue by failing to raise it during either sentencing hearing.  Alternatively, the trial court found it lacked jurisdiction to consider the request because it was not a clerical error, was not raised on direct appeal, and because 120 days had

21

passed since the imposition of the sentence precluding relief under section 1170, subdivision (d).

B

Woldmskel first argues the trial court erred by denying his motion to reduce the restitution fine it imposed. "As a general rule, 'an appeal from an order [or judgment] in a criminal case removes the subject matter of that order [or judgment] from the jurisdiction of the trial court.' (*Anderson v. Superior Court* (1967) 66 Cal.2d 863, 865; see also § 1235, subd. (b) ['An appeal from the judgment or appealable order in a felony case is to the court of appeal for the district in which the court from which the appeal is taken is located'].) However, section 1237.2 is an exception to this general rule." (*People v. Jenkins* (2019) 40 Cal.App.5th 30, 37 (*Jenkins*).)

The statute provides, in full: "An appeal may not be taken by the defendant from a judgment of conviction on the ground of an error in the imposition or calculation of fines, penalty assessments, surcharges, fees, or costs unless the defendant first presents the claim in the trial court at the time of sentencing, or if the error is not discovered until after sentencing, the defendant first makes a motion for correction in the trial court, which may be made informally in writing. The trial court retains jurisdiction after a notice of appeal has been filed to correct any error in the imposition or calculation of fines, penalty assessments, surcharges, fees, or costs upon the defendant's request for correction. This section only applies in cases where the erroneous imposition or calculation of fines, penalty assessments, surcharges, fees, or costs are the sole issue on appeal." (§ 1237.2.)

"[I]f issues *other than* the imposition or calculation of such fines, assessments, and fees are being appealed, such as in the instant case, the limited exception provided by section 1237.2 to section 1235 no longer

22

applies. In this situation, a defendant must seek relief in the Court of Appeal for any issue regarding the imposition or calculation of fines, assessments, and fees, including, if necessary, by requesting leave to file a supplemental brief. (See Cal. Rules of Court, rule 8.200(a)(4).) The Court of Appeal then decides *all* the issues of the case, preventing piecemeal litigation in separate forums." (*Jenkins, supra*, 40 Cal.App.5th at p. 38.) Because Woldmskel's appeal did not involve only the erroneous imposition of the restitution fine, section 1237.2 could not serve as a basis for the trial court's jurisdiction to hear his motion to reduce the restitution fine.[5]

Woldmskel also argues that the court's denial of the motion for lack of jurisdiction was error because the court had the power to recall the sentence under section 1170, subdivision (d). "A court may recall a sentence and resentence a defendant under certain circumstances within 120 days of the defendant's custody commitment. (§ 1170, subd. (d)(1).)" (*Torres, supra*, 44 Cal.App.5th at p. 1085.) This provision, however, gives the trial court the authority to recall the sentence only " ' "within 120 days of the original commitment." ' " (*People v. Hernandez* (2019) 34 Cal.App.5th 323, 326.) After that time has passed, "the court loses 'own-motion' jurisdiction if it fails to recall a sentence….' " (*Ibid.*) Here, Woldmskel's "original commitment" was in 2017, thus his motion was well past the deadline for the court to exercise the authority provided by section 1170, subdivision (d).

---

[5] Woldmskel argues that *People v. Torres* (2020) 44 Cal.App.5th 1081 (*Torres*), supports his assertion that the trial court had jurisdiction to consider his motion under section 1237.2. We disagree. *Torres* held simply that section 1237.2 did not provide a basis for the trial court to consider a motion to reduce a restitution fine long after the defendant's appeal was resolved and the case was final. (*Id*. at pp. 1087–1088.) *Torres* has no bearing on the issue here.

C

Next, relying on *Dueñas*, Woldmskel contends that regardless of his motion in the trial court, its failure to conduct an ability-to-pay hearing before imposing the $10,000 restitution fine, and the court security, criminal conviction assessment, and criminal justice administration fees violated his federal due process rights. We also reject this argument. Woldmskel had the statutory right, and thus was obligated, to object to the imposition of any restitution fine above the $300 statutory minimum. (§ 1202.4, subd. (c) [inability to pay may be considered when the restitution fine is increased above the minimum].) His failure to do so forfeits this claim of error on appeal. (See, e.g., *People v. Smith* (2020) 46 Cal.App.5th 375, 395–396; *People v. Keene* (2019) 43 Cal.App.5th 861, 863–864; and *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.)

In addition, this court has declined to adopt the *Dueñas* court's due process analysis. Instead, we have concluded that due process does not " 'bar[] the imposition of … assessments and [a] ... restitution fine' even as to a defendant who is unable to pay." (*People v. Cota* (2020) 45 Cal.App.5th 786, 795; see *People v. Allen* (2019) 41 Cal.App.5th 312, 326 ["[W]e would adopt the reasoning of the numerous courts that have rejected *Dueñas*'s due process analysis."].) For the reasons set forth in our prior decisions, we reject Woldmskel's due process argument on the merits.

Finally, with respect to the three fees Woldmskel challenges, even if the trial court erred, any error was harmless. Woldmskel "will have the ability to earn prison wages over a sustained period." (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139.) "Prison wages range from $12 to $56 per month, depending on the prisoner's skill level." (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076, citing Cal. Code Regs., tit. 15, § 3041.2 and Cal.

Dept. of Corrections & Rehabilitation, Adult Institutions Operations Manual (2019), art. 12 (Inmate Pay), §§ 51120.1, 51120.6, pp. 354–356.) "The state may garnish between 20 and 50 percent of those wages to pay the section 1202.4, subdivision (b) restitution fine." (*Ibid.*, citing § 2085.5, subds. (a) & (c).)

Given the length of his prison sentence, and contrary to his arguments, Woldmskel will have the ability to pay the $1,064 in fees (as well as the $10,000 restitution fine) based on the wages he may earn in prison.[6] (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes a defendant's ability to obtain prison wages]; § 2085.5 [outlining how a restitution fine balance may be collected from prison wages]; *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060–1061.) We thus reject Woldmskel's request for an ability-to-pay hearing.

---

[6] Woldmskel asserts his mental illness "necessarily impacted his ability to engage in stable employment," establishing his inability to pay. This bare assertion, however, is contradicted by the record, which includes his testimony during the hearing on his motion for mental health diversion that since he has been in prison his mental health has stabilized as a result of treatment. Woldmskel raises no other reason he is unable to earn prison wages.

DISPOSITION

The judgment is affirmed.  The case is remanded to the trial court to amend the abstract of judgment to award Woldmskel custody credits of 1,551 days and to strike the one-year prison prior enhancement under section 667.5.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

AARON, J.